# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

CLERK'S OFFICE
A TRUE COPY
Aug 25, 2023
s/ D. Olszewski
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

| In the Matter of the Search of | ) | |
|---|---|---|
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) ) | Case No.   23   MJ   159 |
| Information associated Facebook User ID: 100040663483405, as further described in Attachment A | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 922(g)(1) & 924 (c) | Felon in Possession of a Firearm and Possession of a Firearm in Furtherance of a Drug Trafficking Crime, and Distribution of Controlled Substances and Conspiracy to Distribute Controlled Substances. |
| 21 U.S.C. §§ 841(a)(1) & 846 | |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Allison Miller
*Digitally signed by Allison Miller*
*Date: 2023.08.24 10:32:48 -05'00'*

*Applicant's signature*

Allison Miller, DEA TFO

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

telephone

*(specify reliable electronic means).*

Date:   8/25/2023

*Judge's signature*

City and state:   Milwaukee, WI

Honorable William E. Duffin, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Allison Miller, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the account.

2.     I am a state certified law enforcement officer who is currently a federally deputized Task Force Officer (TFO) with Group 68 on the Drug Enforcement Administration (DEA) and assigned to the Drug and Gang Task Force with North Central High Intensity Drug Trafficking Area (HIDTA). I have worked full-time as a law enforcement officer for over fifteen years. Prior to working at North Central HIDTA, I was assigned to the West Allis Police Department Special Investigations Unit, which primarily investigates crimes involving narcotics trafficking and prostitution.

3.     I have received training in the investigation of drug trafficking through my assignments related to narcotics investigations for the West Allis Police Department. I have

1

participated in several hundred narcotics-related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, United States currency, and other evidences of criminal activity. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by the traffickers and abusers of controlled substances. I have participated in all aspects of drug investigations, including physical surveillance, execution of search warrants, undercover transactions, and court-ordered wiretaps, analysis of phone and financial records, and arrests of numerous drug traffickers. I have been the affiant on many search warrants. I have also spoken on numerous occasions with other experienced narcotics investigators concerning the methods and practices of drug traffickers and money launderers.

4.　　　I have worked with informants in the investigation of drug trafficking in the Milwaukee area. I have participated in search warrants, investigations, and arrests in which controlled substances, drug paraphernalia, and firearms were seized. I am familiar with the street names of various drugs in the Milwaukee area, including marijuana, ecstasy, heroin, fentanyl, and cocaine. I am familiar with methods that are commonly used by drug dealers to package and prepare controlled substances for sale in the Milwaukee area.

5.　　　I have also participated in investigations involving individuals engaged in the

2

illegal possession and trafficking of firearms. More specifically, through my training and experience, I am aware that these individuals collect, use, and store firearms, retain their used targets and spent casings, unlawfully possess and illegally carry firearms, and photograph themselves displaying firearms, which photographs I know to be kept in residences or places they exercise dominion and control, such as social media accounts. I have worked with local, state and federal law enforcement agents investigating the possession, use, and trafficking of controlled substances and weapons in the Milwaukee area, and I have participated in the execution of numerous search warrants in which weapons were seized.

6.      Through training and experience, I am familiar with the language used over the telephone, social media platforms, and third-party applications to discuss firearm and drug trafficking, and know that the language is often limited, guarded, and coded. I know that firearm and drug traffickers often use electronic equipment to conduct these operations. Furthermore, I know that firearm and drug traffickers often used social media applications, such as Facebook, to discuss firearm and drug sales.

7.      I have participated in multiple firearm and drug trafficking investigations that involved the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these computers, cellular phones, cameras, and other digital storage devices. On many occasions, this electronic data has provided evidence of the crimes being investigated and corroborated information already known or suspected by law enforcement.

3

8.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

9.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18 United States Code, Sections 922(g)(1) and 924(c), Felon in Possession of a Firearm and Possession of a Firearm in Furtherance of a Drug Trafficking Crime, as well as Title 21, United States Code, Section 841, Distribution of Controlled Substances, have been committed by Robert MATTHAEUS and other unknown individuals.  There is also probable cause to search the information described in Attachment A for evidence of these crimes, as described in Attachment B.

## PROBABLE CAUSE

### *Background of Current Investigation*

10.      In November 2022, an undercover ATF Special Agent (hereinafter referred to as the "UC") became Facebook friends with a Facebook user "**Lil Rob Lil Rob**" (**Facebook User ID 100040663483405**; or the "**Target Account**")[1]. The true identity of the user of the Facebook account was later identified by investigators as Robert MATTHAEUS

---

[1] A Facebook user may connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

(MATTHAEUS). Investigators conducted a search of the Milwaukee County Circuit Court system of MATTHAEUS and found that MATTHAEUS is a convicted felon as a result of three Milwaukee County cases. *See State of Wisconsin v. Robert Jeffrey Matthaeus*, Milw. Cty. Case No. 2009CF000444 (Vehicle Operator Fleeing and Eluding); *State of Wisconsin v. Robert Jeffrey Matthaeus*, Milw. Cty. Case No. 2009CF005193 (Possession of a Firearm by a Felon); and *State of Wisconsin v. Robert Jeffrey Matthaeus*, Milw. Cty. Case No. 2018CF000415 (Felony Retail Theft). As a result of these convictions, MATTHAEUS is unable to possess firearms.

11.　　On January 24, 2023, MATTHAEUS commented on one of the UC's Facebook photographs and also sent the UC a direct message via Facebook's messaging platform, Facebook Messenger. Referencing the UC's photograph, which contained an image of three handguns and a box of ammunition, MATTHAEUS asked the UC if the "P89" was for sale. A P89 is the model of one of the handguns depicted in the UC's photograph. The UC informed MATTHAEUS that the firearm he (MATTHAEUS) was referencing had previously been sold, but the UC would attempt to obtain another handgun of the same make and model for MATTHAEUS. The UC and MATTHAEUS continued to communicate sporadically via Facebook Messenger over the next several months. All communication between the UC and MATTHAEUS, including those referenced hereinafter, occurred between the UC's undercover Facebook account and the **Target Account**.

12.　　On July 6, 2023, MATTHAEUS posted a "Story" to the profile of the **Target**

5

**Account** that stated MATTHAEUS had a "Ghost" for sale.[2] The UC, knowing through training and experience that the term "Ghost" refers to a "ghost gun" and is commonly used in street vernacular to reference a Privately Made Firearm ("PMF"), replied to MATTHAEUS's story. THE UC asked what variation of PMF MATTHAEUS was attempting to sell. MATTHAEUS replied, "Tan n [and] black with a gold barrow [barrel] it's raw." The UC informed MATTHAEUS that the UC was interested in purchasing the firearm; however, when MATTHAEUS later responded, MATTHAEUS stated he (MATTHAEUS) was unable to obtain the firearm from the actual possessor, stating, "Ghost gone already bro n FN not for sale lol."

13.     Continuing on July 6, 2023, MATTHAEUS, using the **Target Account**, offered to sell "pounds" of marijuana to the UC. MATTHAEUS then sent the UC multiple videos of suspected marijuana and marijuana wax. The UC stated they would be interested in purchasing marijuana from MATTHAEUS in the future.

14.     Over the next several weeks, the UC and MATTHAEUS engaged in conversation regarding the possession and trafficking of firearms. On July 17, 2023, MATTHAEUS informed the UC another firearm was for sale; however, MATTHAEUS was once again unable to obtain the firearm he intended to sell to the UC.

15.     On July 18, 2023, MATTHAEUS, using the **Target Account**, sent the UC ten

---

[2] Facebook Stories are short user-generated photo or video collections that can be uploaded to the user's Facebook. The Facebook Story a user posts will only be viewable for 24 hours. Users can also limit privacy settings with respect to what audience can view the user's Facebook Story.

separate photographs depicting more than twenty firearms. *See Figure 1.* MATTHAEUS stated he has a firearms "fetish," and that between himself and his son, MATTHAEUS possessed a "crazy [gun] collection."



*Figure 1*
*Two of the photographs sent by MATTHAEUS using the **Target Account** to the UC*

16.     The UC then asked MATTHAEUS if he (MATTHAEUS) would be interested in selling any of the firearms in MATTHAEUS's personal collection. MATTHAEUS stated he would not sell any of the firearms in his personal collection; however, MATTHAEUS would sell the UC other firearms that were available to MATTHAEUS.

17.     Investigators reviewed the photographs that MATTHAEUS sent to the UC and identified MATTHAEUS's firearms consisted of AR-style rifles/pistols, AK-style rifles/pistols, and a variety of other rifles and handguns. Investigators also observed in several photographs, MATTHAEUS's firearms were pictured beside numerous high-capacity

7

magazines that were compatible with the photographed firearms.

*First Undercover Firearms Purchase on August 7, 2023*

18.    On August 3, 2023, the UC messaged MATTHAEUS via the **Target Account** using Facebook Messenger, asking if MATTHAEUS had any marijuana available to be purchased by the UC. MATTHAEUS had previously offered to sell the UC marijuana, marijuana wax, and Xanax bars via Facebook Messenger. MATTHAEUS responded shortly thereafter, stating he (MATTHAEUS) possessed "Just lil personal shit got like 20 grams of some just regular loud nothing special but I can get it w/e u want." Through training, experience, and familiarity with this investigation, the UC understood MATTHAEUS's message to mean MATTHAEUS did not possess large quantities of marijuana at that time, but MATTHAEUS could obtain additional amounts of marijuana for the UC. The UC informed MATTHAEUS that the UC had wanted to purchase approximately 1 to 2 ounces of marijuana from MATTHAEUS on this date, but the UC was content with waiting to purchase these items the following week. The UC also informed MATTHAEUS that the UC was interested in purchasing firearms from MATTHAEUS. MATTHAEUS responded, "Just lmk [let me know] so I'll have some fire smoke set up for u maybe few heats too." Based on their training, experience, and familiarity with this investigation, investigators know that when MATTHAEUS referred to "fire smoke," he was referring to marijuana and that "heats" is a term commonly used in street vernacular to refer to firearms. Therefore, investigators believed MATTHAEUS informed the UC that MATTHAEUS would sell marijuana to the UC

Case 2:23-mj-00159-WED   Filed 08/25/23   Page 9 of 34   Document 1

and, if he had any firearms, he would sell them to the UC too.

19.     On August 6, 2023, the UC contacted MATTHAEUS via Facebook Messenger at the **Target Account**, informing MATTHAEUS that the UC would be in the Milwaukee area the following day (August 7, 2023). MATTHAEUS responded, "Ok bet tmro imma work on seeing if there any steal [steel] around 4 you." Based on their training and experience, investigators know that "steel" is a term commonly used in street vernacular to refer to firearms. Investigators further believe that MATTHAEUS informed the UC that he was going to try and sell a firearm to the UC the next day ("tmro," meaning tomorrow).

20.     On August 7, 2023, beginning at approximately 12:55 p.m., MATTHAEUS messaged the UC on Facebook Messenger using the **Target Account**, stating he (MATTHAEUS) could arrange the sale of several firearms to the UC. One of the firearms offered by MATTHAEUS was also equipped with a "suppressor," which MATTHAEUS confirmed was a "real silencer" due to the fact that the firearm "sounds like a point ball gun" when the silencer was affixed to the firearm's barrel. MATTHAEUS also stated he was in the process of obtaining marijuana that MATTHAEUS intended to sell to the UC during the same transaction.

21.     At approximately 2:15 p.m., MATTHAEUS informed the UC that he (MATTHAEUS) did not have a vehicle to obtain all of the firearms and marijuana previously discussed with the UC; therefore, MATTHAEUS's "cuz [cousin]" would have to obtain the firearms for MATTHAEUS. Furthermore, because MATTHAEUS needed a third-party

9

(MATTHAEUS's cousin) to pick up the firearms for him (MATTHAEUS), MATTHAEUS would only be able to obtain and sell the UC two firearms, one Ruger "5.7" and one Taurus "G2." Regarding the additional firearms that MATTHAEUS had offered to sell to the UC earlier that day, MATTHAEUS stated, "And yes all the other 1s [firearms] u don't grab should be around plus more next time u come…" MATTHAEUS later informed the UC, via the **Target Account**, that he (MATTHAEUS) would charge the UC $1,650 for the two aforementioned handguns. The UC and MATTHAEUS ultimately agreed to meet at a public meeting location near the intersection of South 27th Street and National Avenue in Milwaukee at approximately 4:30 p.m. to conduct the transaction.

22.     After members of law enforcement held an operational briefing, at approximately 4:34 p.m., the UC departed the operation's staging location in an undercover vehicle (UCV) and traveled towards Family Dollar located at 729 South Layton Avenue, Milwaukee, Wisconsin, a business located on the northwest corner of the intersection of South 27th Street and National Avenue. The UC was equipped with audio-/video-transmitting/recording devices as well as an amount of ATF Agent Cashier Funds (U.S. Currency; hereinafter "ACF"). During the entirety of the undercover operation, the UC was followed by a designated cover team.

23.     At approximately 4:42 p.m., the UC messaged MATTHAEUS at the **Target Account** on Facebook Messenger, informing MATTHAEUS that the UC would soon be arriving at the meet location. At approximately 4:44 p.m., MATTHAEUS responded, stating

10

he (MATTHAEUS) was waiting for his cousin to give him a ride to the meet location, and that his cousin was "2-3 min" away. At approximately 4:45 p.m., the UC arrived at Family Dollar and parked in front of the business within a large parking lot.

24.     At approximately 4:51 p.m., the UC observed a white Toyota sedan, occupied by three males, enter Family Dollar's parking lot and circle the UCV. At approximately 4:52 p.m., the Toyota sedan parked beside the UCV on the UCV's passenger side before one of the occupants on the passenger side of the Toyota exited the vehicle holding a black backpack with a red and white logo. This passenger, later identified as J. V., then approached the UCV and entered the front passenger seat with the backpack.

25.     After J. V. entered the UCV, the UC and J. V. exchanged introductions. J. V. identified himself as "Jay" and confirmed he was the "blood cousin" of MATTHAEUS. J. V. then retrieved two firearms from the black backpack, which J. V. had placed between his legs. J. V. displayed the firearms for the UC to examine and then set both firearms on the front middle seat between himself and the UC. The UC examined the firearms and asked if the price for both firearms would be "sixteen," believed to mean $1,600. J. V. paused for a moment and then corrected the UC when he (J. V.) stated, "sixteen fifty," meaning $1,650. Because J. V. was aware how much MATTHAEUS intended to charge the UC for the two firearms ($1,650), the UC understood this to mean MATTHAEUS had discussed the details of the transaction with J. V. prior to J. V.'s arrival.

26.     The UC then counted $1,800 in ACF and handed the funds to J. V. The UC

11

explained that the additional $150 (on top of the $1,650) was being given to J. V. because the UC appreciated "good business." J. V. then counted the ACF provided to him by the UC and confirmed the amount provided to him was $1,800. The UC then again inspected the two firearms provided by J. V. and identified the firearms as follows:

    a. One Type: Pistol; Make: Taurus; Model: G2C; Caliber: .40, bearing Serial No. ACE863047; and

    b. One Type: Pistol; Make: Ruger; Model: Ruger 5-7; Caliber: 5.7x28mm, bearing Serial No.: 64374508.

27.    The UC then inspected the magazines and chambers of the firearms and identified the Taurus G2C pistol was loaded with five rounds of .40 caliber ammunition within the firearm's magazine. The UC asked J. V. if he (J. V.) could provide additional firearms to the UC in the future. J. V. replied, "Yeah. What you need?" The UC informed J. V. that they were interested in purchasing all types of firearms and that the UC was "in the market" to "wheel and deal." J. V. then stated, "I ain't gonna lie, bro.. You [are] with it. I'll.. Imma show you some shit. Text my number [414-326-5607], I'll show you some shit." In this context, the UC understood this to mean J. V. appreciated the UC's business and was interested in selling additional firearms to the UC in the future.

28.    At approximately 4:58 p.m., the UC received an incoming voice call from MATTHAEUS via Facebook Messenger. MATTHAEUS asked the UC if they had just met with MATTHAEUS's cousin (J. V.) and/or provided MATTHAEUS's cousin with any money. The UC informed MATTHAEUS that the UC had just purchased the two firearms from J. V.

12

for $1,800. MATTHAEUS informed the UC that J. V. had cut MATTHAEUS out of the transaction, stating he (MATTHAEUS) had arrived at Family Dollar parking lot when the transaction between the UC and J. V. had just concluded. MATTHAEUS continued, stating he witnessed J. V. exit the UCV and drive off at the same time the UCV had driven off in the opposite direction. MATTHAEUS further explained that when MATTHAEUS approached J. V.'s vehicle (white Toyota), J. V. had flipped his finger up at MATTHAEUS as the driver of the white Toyota and continued to drive away.

29.     The UC, addressing what MATTHAEUS had just informed them, stated they did not fully understand what had transpired between J. V. and MATTHAEUS prior to the UC's transaction with J. V. MATTHAEUS stated J. V. had "run off" with MATTHAEUS's money without providing MATTHAEUS with any of the $1,800 provided to J. V. by the UC. In this context, the UC understood this to mean MATTHAEUS and J. V. had agreed to divide the profit made from the firearms transaction with the UC amongst themselves; however, J. V. did not honor this agreement with MATTHAEUS. Rather, J. V. kept the entire $1,800 for himself. MATTHAEUS then stated, in substance, that the issue was between MATTHAEUS and J. V., and the UC was not at fault. The UC then offered to drive back to Family Dollar to meet with MATTHAEUS and give MATTHAEUS a ride home; however, MATTHAEUS stated this was not necessary.

30.     On the evening of August 7, 2023, at approximately 6:52 p.m., MATTHAEUS messaged the UC using the **Target Account** on Messenger, stating, "Yeah I was omw [on my

way] thru the parking lot to u guys but I told him [J. V.] what kinda truck u were in this my

blood [relative] so [I] didn't think he was gonna play me like tht" and then "But yea he ran

off on me not ur fault gud [you're good] on ur end."

*Second Undercover Purchase on August 14, 2023*

31.    On August 8, 2023, MATTHAEUS messaged the UC via the **Target Account**

on Facebook Messenger, "Another G2 9 for $550 bro." In this context, the UC understood

MATTHAEUS's message to mean MATTHAEUS was offering to sell the UC a Taurus G2

pistol, chambered in 9mm, for $550. The UC informed MATTHAEUS that the UC was

interested in purchasing this firearm but would not be able to purchase the firearm until the

following week.

32.    On August 13, 2023, the UC informed MATTHAEUS via the **Target Account**

on Facebook Messenger that the UC would be able to purchase the aforementioned Taurus

G2 pistol, referenced by MATTHAEUS on August 8, 2023, the following day. MATTHAEUS

responded, "The G2 will be around for sure tmro gonna see what else for u tho bro might be

a Glock too so I'll luk asap." Based on training, experience, and familiarity with this

investigation, investigators know that MATTHAEUS stated that he could sell a Taurus G2

pistol ("G2") the following day ("tmro"), and that MATTHAEUS may be able to sell another

Glock and would let the UC know ("luk," meaning let you know).

33.    On August 14, 2023, beginning at 9:24 a.m., the UC and MATTHAEUS began

discussing the firearms transaction that was anticipated to occur later that date. The UC and

MATTHAEUS ultimately agreed to meet at approximately 2:30 p.m. in Milwaukee, Wisconsin. MATTHAEUS informed the UC that in addition to the Taurus G2 pistol, MATTHAEUS had a Glock 43 with "extra extendos," which are high-capacity magazines, that the UC could purchase for $950. The UC agreed to purchase the Glock 43 pistol and then asked if MATTHAEUS had any "work." The UC knows through training and experience that "work" is a term commonly used in street vernacular to refer to illegal drugs (i.e., cocaine and fentanyl). MATTHAEUS replied, stating he could sell the UC marijuana once MATTHAEUS obtained additional amounts of the controlled substance from MATTHAEUS's marijuana source of supply. MATHAEUS ultimately offered to sell one-half ounce of marijuana (~14 grams) to the UC for $100. MATTHAEUS explained the marijuana he would sell to the UC was "exotic" and MATTHAEUS's marijuana source "gets his shit thru my ppl so gonna be some zaza," which investigators believe to mean is high-quality marijuana.

34.     On August 14, 2023, at approximately 2:00 p.m., law enforcement personnel held an operational briefing to discuss the anticipated undercover operation. At approximately 2:30 p.m., the UC departed the operational staging location in a UCV and traveled towards the intersection of 27th Street and National Avenue, which is where MATTHAEUS asked the UC to meet. The UC was equipped with audio-/video-recording/transmitting equipment and an amount of ACF. Additionally, the UC was followed by a designated cover team during the entirety of the operation. At approximately 2:44 p.m., the UC arrived at Family Dollar, which is located on the northwest corner of the

15

intersection of South 27th Street and National Avenue. The UC parked the UCV in Family Dollar's parking lot and then placed an outgoing audio call to MATTHAEUS at the **Target Account** using Facebook Messenger. Upon the call being connected, MATTHAEUS informed the UC that MATTHAEUS would be arriving at Family Dollar within the next several minutes.

35.    At approximately 2:51 p.m., a white Infiniti entered the Family Dollar parking lot before parking directly next to the UCV's passenger side. The UC then observed MATTHAEUS, clutching a black plastic bag, exit the white sedan's front passenger seat and walk towards the UCV. MATTHAEUS proceeded to enter the UCV's front passenger seat and exchanged greetings with the UC. *See* Figure 2. MATTHAEUS introduced himself to the UC as "Rob" before he produced a Glock 43x pistol that consisted of a light green frame with a black slide, a knotted-off plastic baggie with 9mm ammunition, three Glock 43x magazines, and a knotted-off plastic baggie containing a green leafy substance (suspected marijuana) from the black plastic bag. *See* Figure 3. MATTHAEUS informed the UC that he (MATTHAEUS) was unable to obtain the Taurus G2 pistol that he had discussed with the UC earlier on Facebook Messenger due to the fact that the individual who possessed the Taurus G2 pistol had not responded to MATTHAEUS's calls and/or text messages prior to the UC's arrival.



*Figure 2*
*Screenshots from the recordings capturing MATTHAEUS entering the UCV with the black plastic bag (circled in red on left)*



*Figure 3*

*Screenshot from the recordings capturing MATTHAEUS in the process of providing the Glock 43x (left) and suspected marijuana (right) to the UC*

36. MATTHAEUS confirmed that the price for the Glock 43x was $950 and the price for the half-ounce of marijuana was $100. MATTHAEUS asked if the UC wanted the 9mm ammunition and spare magazines MATTHAEUS had brought, to which the UC affirmed. The UC asked MATTHAEUS if the suspected marijuana weighed one-half ounce, to which MATTHAEUS affirmed.

37. The UC then stated since MATTHAEUS's cousin, J. V., had not shared the

profit made from J. V.'s sale of two firearms to the UC on August 7, 2023, the UC was providing MATTHAEUS with an extra $150 (total of $1,200) as a showing of good faith/business. The UC then counted out $1,200 in ACF before handing the funds to MATTHAEUS. *See* Figure 4. The UC requested MATTHAEUS count the ACF to ensure he (MATTHAEUS) had been provided with the correct amount. MATTHAEUS counted the money and confirmed the amount the UC had provided was $1,200. MATTHAEUS stated he appreciated the UC's generosity and explained he (MATTHAEUS) had felt cheated by J. V. since MATTHAEUS had coordinated and arranged the sale of the two firearms to the UC on August 7, 2023.



*Figure 4*
*Screenshot from the recordings capturing MATTHAEUS receiving the ACF (circled in red)*

38. The UC then asked MATTHAEUS if he (MATTHAEUS) no longer had access to "the work" since MATTHAEUS's fentanyl source of supply had been recently killed. MATTHAEUS had previously disclosed to the UC that MATTHAEUS's fentanyl source had recently been killed in a drug-related homicide. Responding to the UC's question,

Case 2:23-mj-00159-WED   Filed 08/25/23   Page 19 of 34   Document 1

MATTHAEUS stated, "I was selling fentanyl… I was supposed to start talking to his [deceased fentanyl source's] brother again, but I never dealt with him, and he's talking about where we [MATTHAEUS and his deceased fentanyl source] left off. So shit I don't know how serious he is and I never called him back." MATTHAEUS then stated, "My guy that was buying a lot of that shit too, he would come to me and buy 100.. 200 grams of the crack. He just got out. I seen he's on the bracelet though. So, I'm giving him a couple days, I'm gonna get back in touch with him too though." Investigators believe that during this exchange, MATTHAEUS informed the UC that he was supposed to start discussing buying fentanyl from his previous fentanyl source's brother, but that has not yet happened. MATTHAEUS further stated that his guy that bought a lot of fentanyl ("a lot of that shit") just got released from incarceration ("just got out") and is on GPS monitoring ("he's on the bracelet"), so MATTHAEUS was giving that guy a couple of days before getting back in touch.

39.     At approximately 3:01 p.m., MATTHAEUS and the UC exchanged goodbyes and MATTHAEUS returned to the white sedan, which had remained parked in the same place while MATTHAEUS was in the UCV. After MATTHAEUS departed in the white Infiniti sedan, surveillance personnel participating in the operation conducted mobile physical surveillance and followed MATTHAEUS. After the second occupant of the white Infiniti was dropped off at a residence near 655/657 South 29th Street in Milwaukee, surveillance personnel observed MATTHAEUS drive to, park at, and enter a residence located at 2810 West National Avenue, Milwaukee, Wisconsin.

19

## **BACKGROUND CONCERNING FACEBOOK**[3]

40.       Meta owns and operates Facebook, a free-access social networking website that can be accessed at Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

41.       Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, e-mail addressees, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Each Facebook user is assigned a user identification number and can choose a username.

42.       Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each

---

[3] The information in this section is based on information published by Meta on its Facebook website, including, but not limited to, the following webpages: "Privacy Policy," available at https://www.facebook.com/privacy/policy; "Terms of Service," available at https://www.facebook.com/legal/terms; "Help Center," available at https://www.facebook.com/help; and "Information for Law Enforcement Authorities," available at https://www.facebook.com/safety/groups/law/guidelines/.

Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

43.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

44.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that

will typically be visible to anyone who can view the user's profile.

45.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video, and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

46.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. of the date of each call. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

47.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

48.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

49.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

50.     Each Facebook account has an activity log, which is a list of the user's posts

and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

51.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

52.     In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

53.     Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

54.     Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

55.     Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start

23

date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

56.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical

24

location associated with the logged IP addresses, investigators can understand the chronological and geographic context of

the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

57.     Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

58.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of

Case 2:23-mj-00159-WED   Filed 08/25/23   Page 26 of 34   Document 1

Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

<u>CONCLUSION</u>

59.     Based on the foregoing, I request that the Court issue the proposed search warrant.

60.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Meta. Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

61.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

26

## ATTACHMENT A

## Property to Be Searched

This warrant applies to information associated with the Facebook account identified below that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California:

| USER | FACEBOOK IDENTIFICATION (UID) | FACEBOOK USERNAME |
|------|-------------------------------|-------------------|
| Robert MATTHAEUS | 100040663483405 | "Lil Rob Lil Rob" |

1

**ATTACHMENT B**

**Particular Things to be Seized**

**I.    Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)    All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities from November 1, 2022, to the present;

(c)    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from November 1, 2022, to the present, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)    All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook

2

group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user from November 1, 2022, to the present, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account from November 1, 2022, to the present;

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings

3

for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     Records of any Facebook accounts that are linked to the account by machine cookies (meaning all Facebook user IDs that logged into Facebook by the same machine as the account); and

(r)     All records pertaining to communications between Meta and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Title 18 United States Code, Sections 922(g)(1) and 924(c), Felon in Possession of a Firearm and Possession of a Firearm in Furtherance of a Drug Trafficking Crime, and Title 21, United States Code, Section 841, Distribution of Controlled Substances and Conspiracy to Distribute Controlled Substances, since November 1, 2022, through the present, including, for the user ID identified on Attachment A, information pertaining to the following matters:

a.     The possession, purchase, use, trafficking, and distribution of narcotics and firearms;

b.     The purchase, acquirement, and disposal of assets using drug proceeds;

4

c.      Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

d.      Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation; and

e.      The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

## <u>CERTIFICATE OF AUTHENTICITY OF</u>
## <u>DOMESTIC RECORDS PURSUANT TO FEDERAL</u>
## <u>RULES OF EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Meta Platforms, Inc. ("Meta"), and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Meta. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Meta, and they were made by Meta as a regular practice; and

b.      such records were generated by Meta's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Meta in a manner to ensure that they are true duplicates of the original records; and

2.          the process or system is regularly verified by Meta, and at all times

pertinent to the records certified here the process and system functioned properly and

normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13)

of the Federal Rules of Evidence.

_____          _____
Date                                                      Signature

2